**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**E. I. DuPONT de NEMOURS AND CO., CHESTNUT RUN AND AFFILIATED FACILITIES, Defendant.**

**Civ. A. No. 4515.**

United States District Court,
D. Delaware.

March 29, 1974.

Laurence D. Beck, William A. Carey, Phillip B. Sklover, and Vincent A. Fuller, Jr., of Equal Employment Opportunity Commission, Washington, D. C., for plaintiff.

James M. Tunnell, Jr., David A. Drexler, Thomas Reed Hunt, Jr., and A. Gilchrist Sparks, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., John F. Lawless, Legal Department, E. I. DuPont de Nemours & Co., Wilmington, Del., for defendant.

## OPINION

STAPLETON, District Judge:

The Equal Employment Opportunity Commission ("EEOC") brought this suit against E. I. DuPont de Nemours and Company ("DuPont"), pursuant to Title VII of the 1964 Civil Rights Act, to secure relief against allegedly discriminatory employment practices occurring at DuPont's Chestnut Run site and affiliated facilities. DuPont has moved for summary judgment on two grounds. First, it contends that this action is barred because it was filed later than the deadline for Commission suit purportedly established by Title VII as amended in 1972. Alternatively, it asserts that the allegations in the Commission's complaint have not undergone the administrative processing necessary before they can become the basis for a Commission lawsuit.

## I. FACTUAL BACKGROUND.

### A. *The Parker Charge.*

On December 18, 1969, William Parker, a black man who was then unemployed and who possesses a "general" high school education, lodged a charge of discrimination with the EEOC. This charge—dubbed the "Parker charge" by the parties—named as respondent DuPont's Christina Laboratory facility in Wilmington. The charge made these averments:

I went to the above named Company on 11–17–69 seeking employment. I was interviewed by a lady sitting at the front of the personnel office. The interview lasted only a few seconds and I was denied a job. I believe that the reason I was turned away was because of my race (Negro). I believe that this plant is attempting to limit the number of Negro employees.

The EEOC forwarded the Parker charge to the Delaware Department of Labor, Division Against Discrimination. This agency rendered the following findings of fact on January 22, 1970:

On January 20, 1970, I met with Mr. Richard Sterling of the DuPont Company. I showed him the complaint of Mr. Parker. Mr. Sterling had never heard of Mr. Parker. The reasons being his office does not interview or accept applications. All applicants are referred to the Chestnut Run Plant.

SUMMARY: Inasmuch as the facts shown do not substantiate Mr. Parker's complaint, I find no discrimination. . . .

The Commission's records reveal that it regained jurisdiction over the Parker charge on March 29, 1970. It is unclear when the Commission commenced its investigation. However, consultation between the Commission and DuPont initially began on August 20, 1970 when a Commission employee met with various DuPont employees at DuPont's Chestnut Run facility in suburban Wilmington. On January 14, 1971, DuPont's Employee Relations Department received a letter from the Commission's staff in-dicating that the Parker charge raised two issues: the failure to hire Mr. Parker individually and ‧limitation of the number of Negro employees generally. To resolve the second issue, the letter requested that DuPont furnish data about employee characteristics and hiring policies at the Christina Laboratory. On June 4, 1971, the Area Director of the EEOC issued a set of findings concerning both Mr. Parker's personal experience and overall employment conditions at the Christina Laboratory. The Area Director's findings noted DuPont's contention that all hiring for the Christina Laboratory was conducted at DuPont's Chestnut Run site. Among the findings were the following:

The Respondent employs 1,381 persons at its Chestnut Run location and 225 at its Christina Avenue location and is engaged in interstate commerce. Negro employees comprise approximately 10% of the total work force at each of these locations.

\* \* \* \* \* \*

Site inspection,—Respondent records and statements of Respondent officials interviewed indicated that no hiring is performed at the Christina Laboratory and that the normal channels for employment would be referral of Charging Party to the main employment office at the Chestnut Run site.

Of the 225 employees at the Christina Avenue Laboratories, 23 are Negro, including 22 technicians and 1 supervisor.

On February 15, 1972, the Commission rendered its decision of Reasonable Cause on the Parker charge. It exonerated DuPont of discrimination against Mr. Parker on the basis that he had failed to apply to the personnel office at Chestnut Run. However, the Commission also determined that there was reasonable cause to believe that DuPont discriminated against Negroes by maintaining discriminatory hiring practices and segregated departments:

The Findings of Fact, supported by the evidence, further demonstrate that

Respondent employs approximately 1,600 employees, only 160 of whom are Negroes. The evidence reveals that only 6% of Respondent's office and clerical workers are Negroes and 3% of Respondent's craftsmen are Negroes. Approximately 95 percent of the Respondent's laborers are Negroes and 84 percent of Respondent's service workers are Negroes.[1]

According to the Census Bureau figures, approximately 43.6 percent of Wilmington's population is Negro. Title VII permits the use of statistical evidence to determine the existence of a pattern or practice of discrimination. So far as appears from the record, Respondent hires regularly into the above-mentioned positions and has standard entry-level qualification requirements for those positions. Respondent offers no explanation for the disproportionate number of Negroes employed in the subject positions. Accordingly, it is reasonable to infer from the statistical evidence above that Respondent has maintained and continues to maintain unlawful employment policies and practices by failing to hire Negroes as a class into its office, clerical and craftsmen positions because of their race. It is also reasonable to infer that Respondent maintains segregated departments by classifying a disproportionate number of Negroes into its laborer and service workers' positions.

\* \* \* \* \* \*

There is reasonable cause to believe that Respondent is engaged in an unlawful employment practice in violation of Title VII of the Civil Rights Act of 1964, by discriminating against Negroes by failing to hire them because of their race and maintaining segregated departments based on race.

Following the Commission's decision, the parties began efforts to reach a conciliation agreement. This endeavor evi-

dently proved fruitless and, by a letter dated August 18, 1972, the Commission informed DuPont that negotiations would be terminated.

B. *The Complaint In This Action.*

On November 13, 1972, the EEOC filed the complaint in the instant action. Pursuant to a stipulation between the parties, the Commission's complaint has been amended to delete allegations of the original complaint relating to discrimination against women and Spanish surnamed Americans. In its present amended version, that complaint names as the defendant DuPont's "Chestnut Run and affiliated facilities" and then alleges the following forms of racial discrimination:

A. The maintenance of a policy, practice and system of recruitment which operates to exclude blacks from employment or jobs or both.

B. The utilization of pre-employment selection devices and criteria which have the effect of substantially excluding blacks from employment. These devices and criteria include, but are not limited to, the use of various pre-employment tests which have not been validated in accordance with the Commission's Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.

C. The utilization of a system, practice, and policy of hiring which limits the employment opportunities of blacks because of their race.

D. The utilization of a system, practice, and policy of training which limits the employment opportunities of blacks because of their race.

E. The assignment of a disproportionately high number of blacks to less desirable, more menial, or lower-paying positions, or a combination thereof, which offer fewer opportunities for advancement than the posi-

---

1. Much of this data was not referred to by the Area Director. DuPont speculates that it comes from DuPont's EEO–1 Reports filed with the EEOC pursuant to 29 C.F.R. § 1602.1 et seq. (1972).

tions to which other persons are predominately assigned.

F. The utilization of transfer and promotion practices, which include but are not limited to a unit seniority system, which result in a disproportionately high number of blacks being assigned to and retained in positions which are less desirable, more menial, or lower-paying positions, or a combination thereof, which offer fewer opportunities for advancement than positions in and to which other persons are assigned and retained.

G. The maintenance and utilization of a seniority system or systems which tend to adversely affect the job security, promotional opportunities, transfer opportunities, and other terms and conditions of employment of black employees.

### C. *The DuPont Organization.*

DuPont is a large chemical company with facilities and personnel located throughout the United States and in many other parts of the world. DuPont employees generally are classified by it for internal personnel purposes as either "exempt" or "non-exempt". This classification is derived from the Fair Labor Standards Act which, in pertinent part, defines an exempt employee as one "in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a) (1970). Non-exempt employees include clerks, secretaries, nurses, equipment operators, maintenance technicians, laboratory technicians, vehicle drivers and miscellaneous services operators.

DuPont's Chestnut Run facility is composed of eight separate laboratories engaged in chemical research, each of which is attached to a separate department of the Company. DuPont's Textile Fibers Department has been assigned the task of acting as landlord for the entire site.[2] Christina Laboratory is also engaged in chemical research. While it is located on Christina Avenue in the City of Wilmington and not on the suburban Chestnut Run site, the landlord responsibilities for that laboratory are assigned to the Textile Fibers Department.

As part of its landlord function, the Textile Fibers' Department maintains a personnel office at Chestnut Run which oversees the hiring, recruitment and various general personnel services relating to non-exempt employees who are attached to the eight laboratories at Chestnut Run and the Christina Laboratory. In addition to its comprehensive responsibility for personnel matters relating to non-exempt employees, the Chestnut Run Personnel Office occasionally hires exempt employees who are attached to the landlord organization of the Textile Fibers Department. The Chestnut Run Personnel Office has no responsibility with respect to the hiring, job assignment or promotion of any exempt personnel at the two facilities other than certain exempt employees of the Textile Fibers Department who administer the landlord operations at these sites.

It is not disputed that during the relevant period, there were approximately 1,600 persons employed at Chestnut Run and Christina who were either non-exempt employees or exempt employees engaged in performance of the landlord operation. The total number of employees at the two sites was approximately 2,350.

### D. *Other Charges Against DuPont Before The Commission.*

While the Parker charge was undergoing the administrative processing that resulted in this lawsuit, seven other charges lodged against DuPont were making their way through the Commission's administrative apparatus. Each of these charges was sworn on December 16, 1969, and, after deferral to the prop-

2. The landlord function consists of supplying general services, such as safety, protection, transportation, non-exempt employment, maintenance, power, design and product engineering, purchasing, general accounting, and medical services.

er state agencies, was filed with the EEOC on June 17, 1970. The seven charges were filed by black employees of DuPont. These charges claim racial discrimination at a number of DuPont facilities located in Delaware and New Jersey, including Chestnut Run. They allege, among other forms of discrimination, discriminatory promotional practices, testing programs, wage levels and standards and timetables for advancement, the restriction of black employees from certain jobs and employment levels in both the "exempt" and "non-exempt" categories, and limitations on the advancement of certain black wage-role employees.

Following an investigation, the Director of the Commission's Baltimore District Office issued decisions of reasonable cause on these seven charges. These decisions came on December 4, 1972, three weeks after this lawsuit was commenced. With one exception, each of the individual charges was sustained, and in all seven instances the general allegations of discrimination were likewise sustained. These charges have been the subject of several conciliation sessions between the Commission and DuPont and, at the time this motion was briefed, conciliation was expected to continue.

### E. *The Commissioner's Charge.*

On December 14, 1972, one month after the complaint in this action was filed, EEOC Commissioner William Brown, III lodged a charge against DuPont's "Chestnut Run and affiliated facilities." This charge included, virtually verbatim, the allegations contained in the Commission's amended complaint in the case at bar, as well as other allegations beyond

the scope of that complaint. Following deferral to the Delaware Department of Labor, the EEOC began its processing of Commissioner Brown's charge in January 1973. On October 31, 1973; a determination of reasonable cause was issued. Conciliation is still in progress.

### II. THE LIMITATIONS ISSUE.

■ Following its filing on December 18, 1969, the Parker charge was referred to the Delaware authorities. The period of reference apparently expired on March 29, 1970. The instant lawsuit was commenced on November 13, 1972, more than two and a half years later. DuPont submits that the suit was brought too late. It argues that the 1972 Amendments to Title VII of the Civil Rights Act require the EEOC to bring suit within 180 days after it has officially received a charge of discrimination. After this 180 day period has expired, DuPont contends, suit by the Commission is barred.

The issue which DuPont raises has divided the district courts that have previously considered it. Two have sustained DuPont's position; five have sustained the contrary position urged by the EEOC.[3] The arguments for each position have been ably catalogued by Judge Pointer in EEOC v. Union Oil Company, 369 F.Supp. 579 (N.Ala. 1974); it is unnecessary to duplicate that review here. The interpretive task is concededly difficult. There were many twists, turns and compromises on the way to a legislative consensus regarding the 1972 Amendments and the extensive debates which preceded their enactment contain statements which are impossible to reconcile satisfactorily. After trac-

3. Holding that a Commission lawsuit is not barred 180 days after the filing of the charge are: EEOC v. Duff Brothers, Inc., 364 F.Supp. 405 (E.D.Tenn.1973); EEOC v. Mobil Oil Corp., 362 F.Supp. 786 (W.D.Mo. 1973); EEOC v. Bartenders International Union, Local 41, 369 F.Supp. 827 (N.D.Cal. 1973); EEOC v. Huttig Sash and Door Company, C.A. No. 7900–73–H, 371 F.Supp. 848 (S.D.Ala.1974); EEOC v. U. S. Industries, C.A. No. 73–283 (W.D.Tenn. Jan. 2,

1974). Holding that the Commission is barred are: EEOC v. Cleveland Mills Company, 364 F.Supp. 1235 (W.D.N.C.1973); EEOC v. Griffin Wheel, 360 F.Supp. 424 (N.D.Ala.1974); EEOC v. Louisville & Nashville R.R., 368 F.Supp. 633 (N.D.Ala. 1974); EEOC v. Union Oil Co., 369 F.Supp. 579 (N.D.Ala.1974); EEOC v. Birmingham Stove & Range, C.A. No. 73–M–201 (N.D.Ala. Feb. 27, 1974).

ing the steps of the legislative process, this Court believes that the most reliable guidance for decision comes from three sources: the language of the amendment itself, the section-by-section analysis of the amendment submitted by the Joint Conference Committee, and, finally, the well documented Congressional awareness of both the EEOC's experience under the original version of Title VII and of the capability which the EEOC could be expected to possess under the 1972 Amendments. Based primarily on these sources, I conclude that Congress did not intend to bar Commission suit after the passage of 180 days.

Before proceeding to the statutory scheme and legislative history, I note that I do not find the "presumption rules" of statutory construction urged by the parties to be a substantial help in resolving the question presented.[4]

Under Section 706 of Title VII (42 U.S.C. § 2000e–5), an individual must file a charge of employment discrimination within 180 days after the alleged discrimination has occurred. The Commission is then commanded to give notice to the alleged offender within 10 days and to "make an investigation" of the charge. If the Commission "determines after such investigation that there is not reasonable cause to believe that the charge is true," it must dismiss the charge. If it determines that there is reasonable cause to believe the charge is true, the Commission is commanded to "endeavor to eliminate . . . [the] practice by informal methods of conference, conciliation, and persuasion." The statute provides that the Commission "shall make its determination of reasonable cause as promptly as possible and, so far as practicable, not later than one hundred and twenty days from the filing of the charge" or from the end of the period of reference to state authorities.

Subsection (f)(1) of Section 706 is the source of the Commission's right to

---

4. DuPont relies on a line of authority typified by the following observation of the Fifth Circuit:

> A statute which itself creates a new liability, (giving) an action to enforce it unknown to the common law, and (fixing) the time within which that action may be commenced, is not a statute of limitations. It is a statute of creation, and the commencement of the action within the time it fixes is an indispensable condition of the liability and of the action which it permits. The time element is an inherent element of the right so created, and the limitation of the remedy is a limitation of the right.

Simon v. United States, 244 F.2d 703, 705 (5 Cir. 1957), quoting 34 Am.Jur. Section 7, pp. 16–17. See also United States ex rel. Texas Portland Cement Co. v. McCord, 233 U.S. 157, 162, 34 S.Ct. 550, 58 L.Ed. 893 (1914). The usual occasion for employing this doctrine is when the strict time constraints affixed to a legislatively created cause of action clash with the more liberal rules that govern the application of statutes of limitation. The courts have held that the time frame contained in the statute is jurisdictional in effect, and that such remedial measures as tolling provisions cannot excuse a failure to commence suit within the prescribed timetable. See Simon v. United States, *supra;* United States v. McCord, *supra;* United States v. Chicago Golf Club, 84 F.2d 914 (7th Cir. 1936); Carpenter v. United States, 56 F.2d 828, 829 (2nd Cir. 1932). While Amended Title VII does create a new cause of action, it contains no express limitation on the time when the Commission must sue. The rules which command strict application of an express limitation are not helpful in determining whether a limitation should be implied. *Cf.* United States v. McCord, *supra,* 233 U.S. at 163, 34 S.Ct. 550.

The EEOC, on the other hand, relies upon a line of cases holding that where the government seeks recovery for the public treasury, a federal or state statute of limitations may not be applied to bar recovery in the absence of a clearly expressed Congressional intent to that effect. *E. g.,* United States v. Nashville, Chattanooga & St. Louis Ry., 118 U.S. 120, 125, 6 S.Ct. 1006, 30 L.Ed. 81 (1886); United States v. Gera, 409 F.2d 117 (3rd Cir. 1969). Here the question is not whether an express statute of limitation should be applied to the government and the government does not seek recovery for the public treasury. While I need not, and do not, rule on the applicability of any federal or state statute of limitations to actions of this kind, I am confident that the matter is considerably more complex than the EEOC maintains. See *e. g.,* United States v. Georgia Power Co., 474 F.2d 906 (5th Cir. 1973); EEOC v. Louisville & Nashville R. R., *supra.*

sue. In pertinent part, it reads as follows:

> If within thirty days after a charge is filed with the Commission or within thirty days after expiration of any period of reference under subsection (c) or (d) of this section, the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent not a government, governmental agency, or political subdivision named in the charge. . . . The person or persons aggrieved shall have the right to intervene in a civil action brought by the Commission. . . . If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d) of this section, whichever is later, the Commission has not filed a civil action under this section . . . or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission . . . shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice. . . . Upon timely application, the court may, in its discretion, permit the Commission . . . to intervene in such civil action upon certification that the case is of general public importance.
> . . .

The scenario envisioned by this section is fairly explicit. The Commission cannot sue until 30 days after the formal filing of a charge of discrimination or the expiration of a "period of reference" to state authorities to review the charge. During this period and for a period of 150 days thereafter, the Commission is afforded the opportunity to pursue the processes of investigation, determination and conciliation and, if appropriate, to file suit. If the Commission dismisses the charge or if the 180 day period expires without the Commission having filed suit or entered a conciliation agreement satisfactory to the charging party, he is entitled to be notified by the Commission that his right to institute a private enforcement action has matured. The charging party may institute suit at any time within the next 90 days. Intervention by the aggrieved employee in a suit brought by the Commission must be granted as of right. However, the Commission may intervene in an individual action only in the Court's discretion and then only if its application is timely and it certifies to the public importance of the case.

Under the version of Title VII adopted in 1964, the sole role of the Commission was to seek the voluntary compliance of employers. Only the aggrieved employee was entitled to institute a lawsuit. The legislative proceedings to amend the 1964 Act reflect a consensus that private enforcement of Title VII had proven inadequate and that it was necessary to arm the Commission with enforcement authority of its own. The major area of Congressional disagreement was whether Commission initiated litigation or Commission cease-and-desist proceedings offered the best vehicle for compelling employer compliance. Under either scheme, however, it is clear that Congress fully expected that the enforcement activities of the Commission, and not private lawsuits, would carry the major burden of realizing the goals of Title VII.[5] It is equally clear that

5. The Section-by-Section Analysis of the Joint Conference Committee states:

> It is hoped that recourse to the private lawsuit will be the exception and not the

the Congressional demand for Commission enforcement authority, whatever its ultimate form, did not signify a repudiation of the role of informal settlement in Title VII's larger scheme and that "cooperation and voluntary compliance," wherever possible, would remain the "preferred means" for achieving "the goal of employment opportunity." Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147, 7 FEP Cases 84 (1974).

The legislative debate also reveals that Congress was acutely aware of the considerable backlog of cases which had accumulated at the Commission since its inception in 1964. As Congress well knew, in the seven years prior to 1971, the Commission had received 81,000 charges, half of which were still awaiting complete Commission processing.[6] Approximately 14,000 charges had been filed in fiscal 1970, 23,000 in fiscal 1971, and over 32,000 charges were predicted for fiscal 1972.[7] Repeatedly, the legislators stressed that, under the Commission's existing administrative machinery, it took from 18 to 24 months to

process the average charge.[8] Moreover, several congressmen recognized that, far from abating, the volume of charges submitted to the Commission could be expected to increase yearly at a substantial pace.[9] Finally, the legislative debate reveals a widespread Congressional awareness that the proposed 1972 amendments would significantly enlarge the Commission's jurisdiction and, hence, its workload as well.[10]

The implications of the Commission's sizeable workload were not lost on Congress and, indeed, helped to shape the bill that it finally enacted. The need to prevent the Commission from becoming further overextended was a major factor behind Congress' rejection of Commission cease-and-desist proceedings in favor of district court litigation.[11] Similarly, the prospect of continued delay in the Commission's administrative process was the motivating force behind the decision to permit the aggrieved employee to bring suit upon the passage of 180 days after the filing of his charge if Commission efforts on his behalf had not yet been fruitful.[12] The expressions

---

rule and that the vast majority of complaints will be handled through the offices of the EEOC or the Attorney General, as appropriate.
118 Cong.Record S.3462 (Mar. 6, 1972).

**6.** S.Rep.No.92–415, 92 Cong. 1st Sess. 5, 6, 87 (1971).

**7.** *Id.*

**8.** See *e. g.*, the remarks of Senators Fannin, 118 Cong.Record S.699 (Daily Ed. Jan. 21, 1972) ; Dominick, *id.* at 697; Brock, *id.*, at 732; Talmadge, *id.*, at 944; and Allen, *id.*, at 947.

**9.** A number of senators referred to the Commission's forecast that the volume of charges submitted to it would increase yearly at a substantial pace. See, e. g., the remarks of Senator Williams, 118 Cong. Record S.294 (Daily Ed. Jan. 19, 1972).

**10.** Senator Dominick's observations were typical:
To this already substantial backlog one must add the impact of . . . the expanded coverage provided by S.2515. Included for the first time in the expanded coverage are approximately 6.5 million

employees of small employers—that is, those employing between eight and 25 employees, 4.3 million educational employees . . . and 10.1 million state and local governmental employees whose disputes are to be conciliated by the EEOC according to ·a committee adopted amendment. Thus, the EEOC will be responsible for an additional 21 million potential aggrieved persons.
118 Cong.Record S.697 (Daily Ed. Jan. 21, 1972).

**11.** As Senator Talmadge described the matter, "(Cease-and-desist) would place a tremendous additional burden on a federal agency whose past record clearly demonstrates that it is unable to handle its present workload." 118 Cong.Record S.944 (Daily Ed. Jan. 24, 1972).

**12.** The Conference Committee's Section-by-Section Analysis states that "wide latitude should be given individuals . . . to avoid any prejudice to their rights as a result of government inadvertence, delay and error," 118 Cong.Record S.3461, and that "the retention of the private right of action, as amended, is intended to make clear . . . that the person aggrieved does not

of the concern which motivated these provisions were not accompanied by any forecasts of happier days. Indeed, nothing in the legislative record suggests that Congress expected the Commission, with its increased jurisdiction and added responsibility of preparing for litigation superimposed on its existing administrative structure, to be able to accelerate significantly its 18 to 24 month timetable for processing charges.

Viewed in this setting, the 180 day deadline for Commission suit urged by DuPont is impossible to reconcile with the Congressional hope for a major Commission role in the enforcement of Title VII rights. Under the time frame for Commission processing which prevailed in 1972, the vast majority of individual charges would emerge from the Commission's administrative apparatus for suit far later than 180 days after they were first filed. Accordingly, if DuPont's position were upheld, most aggrieved individuals would be denied the representation of the Commission and left to their own devices—the very situation that the 1972 Amendments were enacted to avoid. Moreover, if the Commission were forced to bring suit within 180 days, the Congressional goal of encouraging voluntary compliance would likewise be seriously impaired. Under the pressure of a 180 day deadline, careful factual study of an employer's employment practices and thorough exploration of the potential for conciliation would be sacrificed to the timely institution of a Commission lawsuit.

With this background, acceptance of DuPont's position would require a conclusion that Congress was demanding nothing short of a revolution at the EEOC. Yet even the scattered remarks in the debates which lend some support to DuPont's position are difficult to read as a Congressional mandate that the Commission immediately reduce its processing time by some 70% or lose the power to enforce Title VII.[13]

Nor does the text of Section 706(f)(1) reflect a mandate of these proportions. Congress took the wording of the equivalent subsection in the 1964 Act with its carefully drafted timetable for private actions and inserted an additional authorization for Commission suit in the first sentence. It retained the basic time sequence for private suit and expressly provided for a termination of the individual's right to sue 90 days after that right had matured. No similar deadline was articulated for suits by the Commission.[14] In view of the meticulous treatment of private actions and the obvious practical consequences of a deadline for Commission suits, it is reasonable to assume that Congress would have been explicit on the point if any deadline had been intended.

Finally, the March 5, 1972 Report of the Conference Committee contains significant support for the conclusions that no such cut-off on the Commission's power of suit was intended. Commenting on Section 706(f)(1), the Committee observed:

. . . The retention of the private right of action, as amended, is intended to make clear that an individual aggrieved by a violation of Title VII should not be forced to abandon the claim merely because of a decision by the Commission or the Attorney Gen-

---

have to endure lengthy delays if the Commission or the Attorney General does not act with due diligence and speed." *Id.* at 3462.

13. See e. g., the remarks of Senators Javits at 118 Cong.Record S.1800 (Daily Ed. Feb. 15, 1972) and Dominick, at 118 Cong. Record S.1307 (Daily Ed. Feb. 7, 1972).

14. The closest thing in the text of the Act to a Congressionally mandated timetable for the processing of charges by the Commission reflects an awareness that the time required for Commission action will vary depending on the circumstances. Section 706(b) provides that "the Commission shall make its determination of reasonable cause as promptly as possible and, so far as practicable, not later than one hundred and twenty days from the filing of the charge."

eral, as the case may be, that there are insufficient grounds for the government to file a complaint. Moreover, it is designed to make sure that the person aggrieved does not have to endure lengthy delays if the Commission or Attorney General does not act with due diligence and speed. Accordingly, the provisions described above allow the person aggrieved *to elect to pursue his or her own remedy* under this title in the courts where there is agency inaction, dalliance or dismissal of the charge, or unsatisfactory resolution.

*It is hoped that recourse to the private lawsuit will be the exception and not the rule, and that the vast majority of complaints will be handled through the offices of the EEOC or the Attorney General, as appropriate.* However, as the individual's rights to redress are paramount under the provisions of Title VII *it is necessary that all avenues be left open for quick and effective relief.* (Emphasis supplied)

118 Cong.Record S. 3462 (Mar. 6, 1972).

The Conference Committee's allusions to the "individual's election" to pursue his or her own remedy and the necessity "that *all* avenues be left open for quick and efficient relief" support an infer-

ence that the Commission's right to sue continues after the individual's right has matured. The implication of this language is that individual standing to sue is designed to let the individual *choose* between pursuing his own remedy and relying on the representation of the Commission. Clearly, that choice would be illusory if the Commission's right of action had already been extinguished.

One of DuPont's arguments, understandably pressed with conviction, deserves separate comment. It reasons that if the Commission's standing to sue survives the 180th day after the filing of the charge, the Commission and the aggrieved individual would have concurrent rights of suit for nearly three months. This, DuPont suggests, would be inconsistent with a Congressional aversion to duplicative litigation evidenced in the legislative history. Only by construing subsection (f) as providing *consecutive* rights of suit, DuPont argues, can the legislative policy against parallel actions be carried out.[15]

This argument is not without force. There are numerous statements in the legislative history which reveal a desire to spare employers from the burdens of duplicative proceedings.[16] While almost

---

15. DuPont suggests in a related argument that the failure of Congress to permit the Commission to intervene as of right in private suits indicates that no independent Commission suit was contemplated after the individual's right to sue matures. This Court has found no legislative history which is helpful on the point. The inference DuPont seeks to draw, while plausible, is not a necessary one. As indicated *infra*, Congress may have intended to bar an independent Commission suit not at the end of 180 days, but rather upon the institution of a private action. On the other hand, the limitations on Commission intervention may be explained without reference to any suppositional Congressional concern with duplicitous lawsuits. Congress had a paramount concern that the aggrieved employee secure prompt relief and may have been sensitive to the possibility that intervention by the Commission could broaden an individual suit and thereby delay relief for the aggrieved indi-

vidual. It may be for this reason that Congress decided to give the court discretion as to intervention and prohibit Commission involvement except in those cases of "general public importance" where the Commission's presence in the lead suit would be desirable from the standpoint of the court and the development of the law in this area.

16. The first version of the 1972 Amendments, subsequently rejected, provided for the termination of the individual's right to sue upon commencement of a Commission proceeding to issue a cease-and-desist order and, similarly, termination of Commission proceedings upon the commencement of an individual lawsuit. The House Report on the bill explained this provision as the product of a desire that "duplication of proceedings should be avoided." H.R.Rep.No.92–238, 92nd Cong., 2nd Sess. (1972); U.S. Code Cong. & Admin.News at p. 2148. Senator Williams, Senate sponsor of the bill, of-

all of these statements were made at an early stage of the legislative debate in the context of a proposal to terminate the Commission's cease-and-desist jurisdiction upon the filing of a private suit, there is at least one indication that Congress did not contemplate the possibility of parallel suits under the amendments ultimately adopted.[17]

It is possible to argue, as the Commission does, that any aversion to duplicative litigation which may have existed was simply not reflected in the final legislation. I am inclined toward this view. There clearly is no express prohibition on parallel lawsuits in the final version of the 1972 Amendments. However, even if it were deemed appropriate for this Court to pursue what was perhaps an implicit Congressional goal, I would not consider DuPont's suggestion the appropriate course to follow. Imposing a 180 day limitation on the Commission's right to sue is but one way to implement a policy against parallel suits. Of the alternatives available, it is the most difficult one to reconcile with the overall purpose of the 1972 Amendments and the language there used to spell out the legislative scheme. The danger of concurrent lawsuits will only materialize when the individual actually files an action; the mere fact that he has been notified of his right to sue does not guarantee that he will exercise it. A 180 day limitations period would bar the Commission merely because of the possibility of individual suit. If the individual did not thereafter step forward, no lawsuit would be instituted. This situation would needlessly frustrate the remedial purposes of Title VII.

A better approach, equally effective at preventing duplicating lawsuits, would be to terminate the Commission's right to sue only when an individual action is brought and, contrarywise, to restrict the individual to intervention once a Commission lawsuit has been commenced. An alternative approach would be to bar the Commission altogether during the individual's 90 day period to sue, but restore its standing to sue if the individual remains silent. Although the posture of this case makes it unnecessary to accept or reject these approaches, this Court notes the approval they have received from other courts.[18]

I hold that Section 706(f)(1) of Title VII does not bar a Commission lawsuit upon the passage of 180 days from the filing of the charge. The instant suit was therefore timely brought.

## III. THE SUFFICIENCY OF THE COMMISSION'S ADMINISTRATIVE PROCESS.

DuPont has also attacked the breadth of the Commission's complaint, arguing that the full range of allegations in that complaint are not litigable in this suit because they have not made their way through each stage in the Commission's administrative process. Of the charges before the Commission, DuPont contends that only the Parker charge provides a proper basis for this lawsuit because only the Parker charge had been the subject of a determination of reasonable cause and conciliation at the time the suit was instituted. Since, in DuPont's view, the Commission can litigate only those issues which Parker himself raised or, at most, those issues which a reasonable investigation of his charge would have encompassed, DuPont reasons that this suit must be limited to the hiring and recruitment of "non-exempt" employees working at the Christina Labo-

fered a similar explanation for the provision. 118 Cong.Record S.2300 (Daily Ed. Feb. 22, 1972).

17. See the remarks of Senator Williams at 118 Cong.Record S.2300 (Daily Ed. Feb. 22, 1972).

18. See EEOC v. Huttig Sash and Door Company, C.A. No. 7900–73–H, 371 F.Supp. 848

(S.D.Ala.1974); Henry Crump v. Wagner Electric Corp., 369 F.Supp. 637 (E.D.Mo. 1973); EEOC v. Cronin, 370 F.Supp. 579 (E.D.Mo.1973); EEOC v. Union Oil Co., *supra*; EEOC v. Missouri Pacific Railroad Company, 493 F.2d 71 (8th Cir., 1974).

ratory. Alternatively, DuPont urges that the Commission's investigation and decision of reasonable cause embraced only the hiring and recruitment of "non-exempt" employees at the Christina and Chestnut Run sites, and that the boundary of this lawsuit must, at the least, be similarly limited. DuPont's final argument is its most sweeping. Because, DuPont submits, the Commission's decision of reasonable cause on the Parker charge was based on erroneous statistical data, that step in the Commission's administrative process must be considered defective and this lawsuit in its entirety must be barred.

### A. *The Relevant Charges.*

■ This Court agrees that a charge must undergo complete administrative processing—investigation, decision of reasonable cause and conciliation—before it can become the basis for a Commission suit.

Section 706(f) of Amended Title VII authorizes the Commission to bring a civil action against offending employers. It creates only one pre-condition for a Commission lawsuit—the Commission's inability, within thirty days of the filing of the charge or the expiration of a period of reference, to "secure from the respondent a concilation agreement acceptable to the Commission." However, Section 706(b) retains virtually intact the administrative format for Commission action created by original Title VII. The Commission is directed to investigate each charge, determine whether there is reasonable cause to believe that the charge is true and, if there is, undertake informal conciliation to achieve employer compliance. The Commission argues that only Section 706(f), and not Section 706(b), defines the prerequisites for a Commission lawsuit. The procedures delineated in the latter section, it claims, are merely directory; they govern internal Commission action but not when and under what circumstances the Commission has standing to maintain suit.

The flaw in the Commission's approach is that it views the Commission's power of suit and its administrative process as unrelated activities, rather than as sequential steps in a unified scheme for securing compliance with Title VII. The Commission's functions of investigation, decision of reasonable cause and conciliation are crucial to the philosophy of Title VII. It is difficult to believe that Congress directed the Commission to make a determination of reasonable cause on the merits of a charge and nevertheless contemplated that the Commission could institute litigation before it makes such a determination. Similarly, it is difficult to conclude that Congress directed the Commission to conciliate and then authorized it to initiate adversary proceedings before the possibility of voluntary compliance has been exhausted. As the Supreme Court has noted, voluntary compliance was selected as the preferred means for achieving the legislative goal:

> Congress enacted title VII . . . to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin. . . . Cooperation and voluntary compliance were selected as the preferred means for achieving this goal. To this end, Congress created the Equal Employment Opportunity Commission and established a procedure whereby existing State and local equal employment opportunity agencies, as well as the Commission, would have an opportunity to settle disputes through conference, conciliation, and persuasion before the aggrieved party was permitted to file a lawsuit.

Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147, 7 FEP Cases 84 (1974).

The 1972 Congressional authorization for Commission suits seems intended not as an alternative but as a supplement to the Commission's pre-existing administrative process, available only when that

process has been exhausted and the Commission has still not achieved employer compliance.[19] It, therefore, follows that the Commission must complete its investigation, determination of reasonable cause, and conciliation of a charge before it can institute suit. *Cf.* EEOC v. Container Corp. of America, 352 F.Supp. 262 (M.D.Fla.1972).

The many decisions holding that, under the original version of Title VII, an individual may sue even though his charge has not been fully processed by the Commission do not dictate a contrary rule. *E. g.,* Johnson v. Seaboard Airline R.R. Co., 405 F.2d 645 (4th Cir. 1968); Jefferson v. Peerless Pumps Hydrodynamic, 456 F.2d 1359 (9th Cir. 1972); Miller v. International Paper Co., 408 F.2d 283 (5th Cir. 1969). The primary rationale for these decisions is the injustice of postponing individual relief merely because the Commission has been unable to give the individual's grievance its prompt attention. *E. g.,* Johnson v. Seaboard Airline R.R. Co., *supra,* 405 F.2d at 649. Section 706(f)(1) of Amended Title VII fully protects the aggrieved individual from administrative delay by letting him bring suit 180 days after he has filed his charge, regardless of the status of that charge before the Commission. The motivation for this provision does not, however, warrant excusing the Commission from following the procedures which Congress has spelled out for it.

In addition to the Parker charge, seven other individual charges and one Commissioner's charge were outstanding against DuPont at the time the complaint in this case was filed. However, as of that date, only the Parker charge had completed each stage in the Commission's administrative process. The record indicates that the conciliation process with respect to all but the Par-

ker charge is still on-going. For the present, then, only the Parker charge can serve as a basis for this suit.

B. *The Permissible Scope Of The Proceeding Before The Commission.*

■ Because the Commission acquired its power of suit so recently, there is a dearth of precedent on the permissible scope of Commission proceedings which grow out of an individual charge of discrimination. The very structure of Amended Title VII, however, suggests that the Commission's discretion to broaden the allegations of an individual charge is not unlimited. Except when a Commissioner himself submits a charge, the Commission's investigation can be triggered only by a charge "filed by or on behalf of a person claiming to be aggrieved." The Commission is to determine whether there is reasonable cause to believe "the charge" is true. It is then directed to endeavor to eliminate "such alleged unlawful employment practice" by conciliation. 42 U.S.C. § 2000e–5(b). Any subsequent suit must be against a respondent "named in the charge." 42 U.S.C. § 2000e–5(f)(1). As Judge Pointer has indicated,[20] these statutory provisions would clearly suggest that the complaint in a Title VII proceeding must be reasonably related to the areas of alleged employment discrimination to which the charge refers.

The statutory nexus between the charge and the Commission's subsequent proceedings does not, however, warrant fragmenting those proceedings to a degree which subverts the overall objective of eliminating discriminatory employment practices. For this reason, the courts that have interpreted Title VII have permitted both individual litigants and the Commission to challenge

---

19. The legislative history confirms this view. As Representative Perkins observed:

 The conferees contemplate that the Commission will continue to make every effort to conciliate as is required by existing law. Only if conciliation proves to be impossible do we expect the Commission to bring ac-

tion in Federal district court to seek enforcement.
Cong.Record H.1861, Mar. 8, 1972.

20. EEOC v. Union Oil Co., 369 F.Supp. 579 (N.D.Ala.1974).

employment practices which the individual charge, strictly construed, did not place in controversy.

In Sanchez v. Standard Brands, 431 F.2d 455 (1970), the leading decision in this area, the Fifth Circuit held that the allowable scope of an individual lawsuit is not defined by the allegations that the individual included in his charge but rather by "the scope of the EEOC investigation which can reasonably be expected to grow out of" that charge. 431 F. 2d 466. The *Sanchez* court expressly endorsed Judge Smith's formulation in King v. Georgia Power Co., 295 F.Supp. 943 (N.D.Ga.1968), that a judicial complaint may "encompass any kind of discrimination like or related to allegations contained in the charge and growing out of such allegation during the pendency of the case before the Commission."[21]

The doctrine that the Commission may take the charge as a starting point and include in its deliberations all facts developed in the course of a reasonable investigation of that charge is supported by a number of considerations. First, in the overall framework of Title VII, an individual charge operates not so much as a formal accusatory instrument like an indictment but, rather, as the first step in an investigatory process that must be free to define relevant areas of inquiry as it unfolds. To mandate blinders for Commission investigators or to require that they pursue any additional discrimination disclosed by their investigation in a separate Commissioner's charge would be to sanction a waste of valuable and limited resources. Second, the charge is generally lay-drawn, often by an individual of modest intellectual attainment whose powers of articulation are limited. Jenkins v. United Gas Corp., 400 F.2d 28, 30 (5th Cir. 1968). The precise language of the charge, therefore, provides less guidance for subsequent proceedings then the

general character of the grievances to which the charge alludes. Third, the individual claiming to be aggrieved often perceives only dimly the nature and cause of the discrimination he believes he has experienced. Sanchez v. Standard Brands, *supra,* 431 F.2d at 462–463. The limited grievance he asserts may merely symptomize a deeper pattern of discrimination which only a trained investigator can recognize. Fourth, employment discrimination, almost by definition, is *class* discrimination, both in the factors that produce it and the consequences which it leaves in its wake. Blue Bell Boots, Inc. v. EEOC, 438 F.2d 32 (6th Cir. 1971). The Commission's power to redress individual grievances, then, implies the power to correct the underlying conditions responsible for those grievances, as well as the power to seek relief for other members of the grievant's class.

This Court adopts the Fifth Circuit's formulation in *Sanchez, supra,* for the purpose of determining whether the Commission's determination of reasonable cause in this case was impermissibly broad. There is no occasion to attempt to delineate the outer limits of a Commission proceeding which the Parker charge might have occasioned. It is sufficient to hold that the proceedings that in fact took place were within permissible limits.

 William Parker charged (1) that DuPont had denied him employment at the Christina Laboratory because of his race and (2) that "this plant" was "attempting to limit the number of Negro employees." In the course of investigating the second portion of the charge, the attention of the Commission inevitably focused on employment policies and practices at the Chestnut Run site since the Chestnut Run Personnel Office was vested with authority, in personnel matters, over employees at both

21. Sanchez has been widely followed. See, *e. g.,* Arey v. Providence Hospital, 55 F.R.D. 62 (D.D.C.1972) ; Mack v. General Electric Company, 329 F.Supp. 72 (E.D.Pa.1971). Also reflecting the *Sanchez* approach are the many cases that liberally define the proper

limits of the Commission's subpoena power. See Parliament House Motor Hotel v. EEOC, 444 F.2d 1335 (5th Cir. 1971) ; Blue Bell Boots, Inc. v. EEOC, 418 F.2d 355 (6th Cir. 1969) ; Graniteville Co. v. EEOC, 438 F.2d 32 (4th Cir. 1971).

the Christina Laboratory and Chestnut Run. Once the Commission's inquiry properly expanded to the Chestnut Run Personnel Office, the statutory scheme clearly did not require that it ignore any evidence of discriminatory practices which it found there, be they related to Chestnut Run, Christina Lab or both. The Commission need not confine itself to the particular symptom of discrimination identified by a charge if a reasonable investigation of that charge uncovers a root source of discrimination responsible for that and other violations of Title VII.

■ Similar logic requires rejection of the contention that the scope of the charge limited the permissible scope of the Commission proceedings to hiring, recruitment and pre-employment processing. If the Commission's investigation of the charge of "limiting the number of Negro employees" uncovered evidence suggesting, as the Commission maintains here, that DuPont has maintained segregated departments by classifying a disproportionate number of Negroes into its laborer and service worker positions, this Court sees no reason why these employment practices should not be included in the Commission's determination of reasonable cause.

■ Finally, I am unpersuaded that the scope of the Commission's proceedings was impermissibly broad in the categories of jobs or employees encompassed by its determination of reasonable cause. The Commission was not required by Parker's own personal qualifications to investigate only personnel practices pertaining to jobs for which he might qualify. DuPont's classification of its employees as "exempt" or "non-exempt" can have no proper bearing on the permissible scope of the Commission's proceedings. This classification is relevant to the questions presently before the Court only to the extent that it may correspond with the scope of the limited findings made by the Commission in its determination of reasonable cause.

## C. The Commission's Determination Of Reasonable Cause And The Proper Scope Of This Action.

Although the Parker charge gave the Commission authority to investigate the full range of employment practices encompassed by its determination of reasonable cause, it is a separate question whether the Commission is now entitled to litigate all of the issues framed by its complaint filed in this Court. DuPont contends that the issues tendered by this complaint go far beyond those encompassed by any reasonable construction of the determination of reasonable cause. The Commission, on the other hand, maintains that the right of suit conferred by Section 706(f) is not restricted to those employment practices as to which it has made a determination of reasonable cause. It suggests that evidence may be unearthed after it has made its determination which indicates the existence of additional discrimination and the desirability of broader relief. In such instances, the Commission argues, the objectives of conserving judicial resources and effectively enforcing Title VII dictate that the Commission be permitted to expand its complaint beyond the scope of its determination. Alternatively, the Commission contends that, in any event, the scope of the complaint in this case and that of its determination are equivalent.

As this opinion has earlier stressed, each step in the Commission's administrative process is designed to be a prerequisite to the following step and, ultimately, to suit. Congress, committed as it was to voluntary compliance, could not have intended that the Commission could attempt conciliation on one set of issues and, having failed, litigate a different set. Since the determination of reasonable cause defines the framework for conciliation, it follows that the issues to be litigated here must be those which can fairly be said to be encompassed within the determination resulting from the Parker charge.

The respondent named in the Commission's determination is "E. I. DuPont de Nemours & Co., Inc." This broad lan-

guage is consistent with the Commission's position that it proceeds against employers and not facilities. The Commission concedes, however, that it has not determined there is reasonable cause to believe that DuPont's entire operations are characterized by discriminatory practices. Moreover, it is clear from its text that the Commission's determination was directed to a particular segment of DuPont's operation at Chestnut Run and the Christina Laboratory—a segment which employed approximately 1,600 people. It appears to the Court that the segment referred to in the determination is that which is administered, insofar as personnel matters are concerned, through DuPont's Chestnut Run Personnel Office[22]—namely, those operations conducted at Chestnut Run and Christina Lab by nonexempt employees and exempt employees associated with the landlord operation.[23]

Within this segment of DuPont's operations, the Commission's determination found reasonable cause to believe there were discriminatory practices with respect to certain classifications of employees. After citing the relevant statistics for DuPont's office workers, clerical workers, craftsmen, laborers and service workers, the Commission found that DuPont hires regularly into, and has standard entry qualification requirements for, "the above mentioned positions" and noted DuPont's failure to offer an explanation for the disproportionate number of Negroes employed in those "subject positions." The Commission concluded that there was reasonable cause to believe (1) that DuPont has failed to "hire Negroes as a class into its office, clerical and craftsmen positions" and (2) that DuPont "maintains segregated departments by classifying a disproportionate number of Negroes into its laborer and service worker positions."

These are the issues which have been framed by the Commission based on its investigation of the Parker charge; this suit, for present purposes at least,[24] must be limited to these two charges. The Commission's characterization of these charges, however, must be given a reasonable construction in light of the nature of the evil against which Congress sought to guard. The wording used by the Commission need not be given the most restrictive interpretation which a literal reading might justify in disregard of the context of the finding of reasonable cause.

In charging maintenance of segregated departments by classification on the basis of race, the Commission clearly had in mind more than the hiring and assignment of new employees. The

---

22. The Commission's complaint names as defendants in this action "E. I. DuPont de Nemours & Company, Chestnut Run and affiliated facilities." The Commission has defined the term "affiliated facilities" to refer to "all laboratories, experimental stations, plants, factories or other establishments which are owned or operated by E. I. DuPont de Nemours & Company, in the State of Delaware, and which in any way utilize the services of, or at any time work with the personnel office at Chestnut Run." This Court is satisfied that this definition is far broader than the segment of DuPont's operations which the Commission had in mind when it issued its determination of reasonable cause. It supports the view, however, that the focus of the Commission proceeding was on the segment of DuPont's operations associated with the Chestnut Run Personnel Office.

23. To the extent there can be debate about the scope of the relevant segment of Du-

Pont's operations, it is because the Commission has consistently maintained that this suit is not limited to the scope of its determination and has not taken a clear position as to the precise scope of the 1,600 employee operation referred to in its determination. If the Commission believes the Court has erred in interpreting the segment of DuPont's operations to which its determination was directed, it may hereafter bring any clarifying data to the Court's attention.

24. The Court is not currently in a position to determine whether the scope of this action might hereafter be broadened by consolidation or supplemental pleading once the administrative process with respect to the other charges is completed. Such a determination would necessarily have to take into account the then current stage of this litigation, the scope of the issues sought to be added, and possibly other matters not presently determinable.

Commission based its finding of segregated departments on statistical data indicating that there was a disproportionately high number of negroes currently employed by DuPont as laborers and service workers and a disproportionately low number currently employed as office and clerical workers and as craftsmen. Hiring and initial job assignment are not the only employment practices which can produce such a result. When the complaint in this action refers to training, assignments, promotions and seniority, it would appear to be particularizing classification practices which allegedly produce segregated departments rather than expanding on the finding of reasonable cause. At the very least, this Court is unwilling to now hold that the alleged discriminatory practices itemized in the complaint could not have played a part in the challenged classification of employees into segregated departments.

In summary, the scope of this case will be limited to the scope of the Commission's determination of reasonable cause. Accordingly, assuming the case in its present posture goes to final judgment in the Commission's favor, relief will be limited to that segment of Du-Pont's operations referred to in the determination and to the two forms of discrimination therein charged. On the present record, however, the Court is unwilling to rule out of bounds any of the allegations of the lettered subparagraphs in paragraph 6 of the Commission's complaint.

D. *The Validity Of The Commission's Determination Of Reasonable Cause.*

■■ DuPont's final argument runs as follows: "Congress . . . intended the EEOC to investigate each charge meaningfully and make its determination upon evaluation of the evidence.

Yet, it is demonstrable on the record that the opinion rendered by the EEOC . . . was based on inferences drawn from the comparison with inapplicable statistics. This being the case, a necessary prerequisite to suit was not fulfilled. . . ." The reference to "inapplicable statistics" is to the utilization by the Commission of the Census Bureau figure of a 43.6% negro population in the City of Wilmington. DuPont maintains that the relevant hiring area for Chestnut Run is not the City of Wilmington and that the appropriate hiring area has a negro population of somewhere in the neighborhood of 11.3% to 12.7%.[25] One cannot fault DuPont's statement of what Congress expected from the EEOC. It does not follow, however, that Congress intended the federal courts to review Commission determinations of reasonable cause to see if they are supported by insubstantial evidence or, as here alleged, by inapplicable statistics. It is one thing for courts to insist upon procedural compliance with the Act and quite another for them to test the factual basis for Commission action. The potential for delay and diversion which such an undertaking would create is substantial; the limited benefit to be derived from such an approach is insufficient to outweigh this drawback. The Commission's determination does not establish rights or obligations; the respondent is entitled to a trial *de novo* in the district court. If the charge is frivolous or misdirected, procedures are there available by which the respondent may extricate himself from liability.

However, even if there are instances in which judicial review of the evidentiary basis for Commission determinations of reasonable cause would be warranted,[26] I am satisfied that this

---

25. The EEOC has admitted that "the actual geographic hiring area, i. e., the source of employees, for the Christina Laboratory and the Chestnut Run facility is not limited to the corporate limits of the City of Wilmington, Delaware." The Commission has not conceded that the relevant negro population is 12 or 13%.

26. The question appears to be one of first impression. This Court reads EEOC v. New York Times Broadcasting Service, Inc., 364 F.Supp. 651 (W.D.Tenn.1973) as holding only that the scope of the Commission's complaint in that case exceeded that of the employee's charge to a degree impermissible under the *Sanchez* standard. The court's comments regarding the Commission's statis-

case does not present such a situation. Even on DuPont's theory of the relevant hiring area, the Commission's determination relies on employment statistics for DuPont's office and clerical workers, craftsmen, laborers and service workers which deviate substantially from its 12% population figure. I, of course, express no view at this time on the significance of these statistics, but it seems clear that pursuit of their significance at this stage of the case would occasion a diversion from the primary objective in a Section 706(f) suit. The statute "is pregnant with an urgency that is incompatible" [27] with such an approach.[28]

### CONCLUSION

DuPont's motion for summary judgment will be denied. Subsequent proceedings in this case will be limited, however, in accordance with the conclusions reached by the Court in this Opinion.

Submit order.

tics do not read on the facts of this case. Even on DuPont's theory of the relevant hiring area, among the relevant comparative statistics would seem to be a disparity between a 3% employment rate among craftsmen and a 12% population figure.

**27.** United States v. International Association of B., S. & O. I W., L. No. 1, 438 F.2d 679, 681 (7th Cir. 1971).

**28.** Section 707(b), for example, provides that "it shall be the duty of the judge designated pursuant to this section to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited."