EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Appellant,

v.

The GREAT ATLANTIC & PACIFIC TEA COMPANY, Appellee.

No. 83–1503.

United States Court of Appeals, Third Circuit.

Argued April 6, 1984.

Decided May 18, 1984.

David L. Slate, Gen. Counsel, Philip B. Sklover, Associate Gen. Counsel, Vincent Blackwood, Asst. Gen. Counsel, Jeffrey C.

Bannon (argued), Counsel, E.E.O.C., Washington, D.C., for E.E.O.C.

Mari M. Gursky (argued), Jerome A. Hoffman, Patrick Johnston, Dechert Price & Rhoads, Philadelphia, Pa., for the Great Atlantic, & Pacific Tea Co., Inc.

Before GIBBONS and SLOVITER, Circuit Judges, and MENCER, District Judge*.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

The Equal Employment Opportunity Commission (EEOC) appeals from a summary judgment in favor of the Great Atlantic & Pacific Tea Company, Inc. (A & P). EEOC filed the instant complaint on December 31, 1981, charging A & P and certain labor organizations with which A & P had collective bargaining relationships with race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2, 2000e–3 (1976). On May 18, 1983, the district court held that the complaint, which seeks injunctive relief and back pay, must be dismissed on the ground of laches. This appeal represents this court's first occasion to consider the application of the equitable doctrine of laches to suits by the EEOC.[1] We hold that the district court erred in applying the doctrine in this case. Accordingly, we will reverse the judgment of the district court and remand for further proceedings.

I.

### The Statutory Scheme

■ Since 1972 the EEOC has been authorized to bring suits to enforce Title VII.[2] Before such a suit is filed, however, the EEOC must follow a series of prescribed administrative steps. The administrative process begins with the filing of a charge. Charges may be filed by aggrieved individuals and by members of the Commission. 42 U.S.C. § 2000e–5(b) (1976). After a proper and timely charge has been filed, the EEOC must within ten days notify the respondent of the charge. *Id.* Neither an individual charge nor a Commissioner's charge need be supported by reasonable cause at the time of its filing. *EEOC v. Shell Oil Co.,* —— U.S. ——, ——, 104 S.Ct. 1621, 1634, 80 L.Ed.2d 41 (1984). An employer notified of a charge is obliged by regulation to preserve relevant personnel records until the charge's final disposition. *Id.* —— U.S. at —— n. 35, 104 S.Ct. at 1636 & n. 35; 29 C.F.R. § 1602.14 (1983).

After serving notice of the charge on the respondent, the Commission must commence an investigation. This investigation culminates in a "reasonable cause" determination. If it determines that there is not reasonable cause to believe that the charge is true, the EEOC must dismiss the charge and notify the charging party and the respondent. If, however, the Commission determines "after such investigation that

---

* Hon. Glenn E. Mencer, United States District Judge for the Western District of Pennsylvania, sitting by designation.

1. In *EEOC v. E.I. duPont de Nemours & Co.,* 516 F.2d 1297, 1302 (3d Cir.1975), we had no occasion to address those defenses that might be available to employers for EEOC delay in commencing suit. Application of the laches defense to the EEOC has been presented in other courts of appeals with some frequency. *See EEOC v. Dresser Indus., Inc.,* 668 F.2d 1199, 1200–04 (11th Cir.1982); *EEOC v. Alioto Fish Co.,* 623 F.2d 86, 87–89 (9th Cir.1980); *EEOC v. Massey-Ferguson, Inc.,* 622 F.2d 271, 275–80 (7th Cir. 1980); *EEOC v. Westinghouse Elec. Corp.,* 592 F.2d 484, 485–87 (8th Cir.1979); *EEOC v. Liberty Loan Corp.,* 584 F.2d 853, 857–58 (8th Cir.1978); *EEOC v. American National Bank,* 574 F.2d

1173, 1175–76 (4th Cir.), *cert. denied,* 439 U.S. 876, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978).

2. The Civil Rights Act of 1964 authorized the EEOC to investigate and conciliate charges of discrimination. If the EEOC was unable to conciliate a grievance, the charging party could initiate a private suit within 30 days after having received notice that conciliation efforts had failed. Civil Rights Act of 1964, Pub.L. No. 88–352, § 706(a), (e), 78 Stat. 241, 259–60 (codified as amended at 42 U.S.C. § 2000e–5(a), (e) (1976)). In 1972 Congress expanded the coverage of Title VII and authorized the EEOC itself to bring suit to enforce the Act after the failure of conciliation efforts. Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, § 4, 86 Stat. 103, 104.

there is reasonable cause to believe that the charge is true, [then it] shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation and persuasion." 42 U.S.C. § 2000e–5(b) (1976). Only after the EEOC determines that it has been unable to secure from a respondent a satisfactory conciliation agreement may it bring a civil action. 42 U.S.C. § 2000e–5(f)(1) (1976).

The Act imposes no maximum time limitation on these three steps in the administrative process: (1) the filing of a charge; (2) the determination of reasonable cause; and (3) the filing of a complaint.[3] *See Occidental Life Ins. Co. v. EEOC,* 432 U.S. 355, 360, 97 S.Ct. 2447, 2451, 53 L.Ed.2d 402 (1977). The absence of any time limitation governing the second stage of the administrative process—the "reasonable cause" determination—is consistent with Congress' understanding that the investigation of employment discrimination charges often requires complex and time-consuming statistical analyses [4] and that the Commission has limited resources and

substantial administrative responsibilities.[5] The absence of any maximum time limitation on the third stage—the filing of a complaint—is consistent with the emphasis in the statute on conciliation. Courts considering the question have assumed that an agency effort at conciliation is a prerequisite to suit.[6] Congress attached such significance to conciliation as a preferred resolution of Title VII claims that it has expressly authorized stays of suits for up to sixty days for "further efforts of the Commission to obtain voluntary compliance." 42 U.S.C. § 2000e–5(f)(1) (1976). The agency has implemented that provision by providing by regulation that its General Counsel may negotiate conciliation agreements during any such stay. 29 C.F.R. § 1601.-24(b) (1983).[7]

## II.

### A. The Charges Against A & P

On October 17, 1974, EEOC Commissioner John Powell filed a Commissioner's charge against A & P. The Commission, in

---

**3.** As a practical matter, delays in the first stage of the administrative process—the filing of a charge—are circumscribed by the availability of back pay. Back pay is limited to the two-year period preceding the filing of a charge with the EEOC. 42 U.S.C. § 2000e–5(g) (1976).

**4.** The complexity of a Commissioner's pattern-or-practice charge has not been lost on the Supreme Court. *See EEOC v. Shell Oil Co.,* —— U.S. ——, ——, 104 S.Ct. 1621, 1632–33, 80 L.Ed.2d 41 (1984), observing that at the time a Commissioner's charge is filed, the Commissioner has evidence only of "statistical manifestations of the net effects of the employer's practices." Rarely, the Court held, can the Commissioner "identify any single instance of discrimination until the Commission has gained access to the employer's personnel records." *Id.* The Commissioner's charge in *EEOC v. Shell Oil Co.* identified thirteen occupational categories to which employees had been denied equal access and alleged discrimination in "recruitment, hiring, selection, job assignment, training, testing, promotion, and terms and conditions of employment" during the period from 1964 to the present. *Id.* The process of identifying specific instances of discrimination for the purpose of making reasonable-cause determinations is, for a charge of this complexity, a task of no small magnitude.

**5.** *See Occidental Life Ins. Co. v. EEOC,* 432 U.S. 355, 362–64, 97 S.Ct. 2447, 2452–53, 53 L.Ed.2d 402 (1977) (quoting House Report acknowledging the Commission's "burgeoning workload," "insufficient funds and a shortage of staff").

**6.** *See Patterson v. American Tobacco Co.,* 535 F.2d 257, 272 (4th Cir.), *cert. denied,* 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976); *EEOC v. Hickey-Mitchell Co.,* 507 F.2d 944, 947–48 (8th Cir.1974); *EEOC v. U.S. Pipe & Foundry Co.,* 375 F.Supp. 237, 244 (N.D.Ala.1974); *EEOC v. E.I. duPont de Nemours Co.,* 373 F.Supp. 1321, 1333–34 (D.Del.1974), *aff'd,* 516 F.2d 1297 (3d Cir. 1975); *EEOC v. Westvaco Corp.,* 372 F.Supp. 985, 991–93 (D.Md.1974). *Cf. Brennan v. Ace Hardware Corp.,* 495 F.2d 368, 374–75 (8th Cir. 1974) (Secretary of Labor must attempt conciliation of a charge under the Age Discrimination Employment Act before suing).

**7.** The EEOC has separate statutory authority analogous to that provided in section 10 of the National Labor Relations Act, 29 U.S.C. § 160(e) (1982), to seek *pendente lite* relief pending final agency disposition of a charge. 42 U.S.C. 2000e–5(f)(2) (1976).

turn, filed the charge with the EEOC's Philadelphia Regional Office on October 23, 1974. Pursuant to 42 U.S.C. § 2000e–5(d) (1976),[8] the Philadelphia Office referred the Commissioner's charge to the appropriate state and local agencies. Those agencies waived jurisdiction on November 18. On December 6, 1974, the EEOC served notice of the charge on A & P. That notice obliged A & P to preserve all relevant personnel records. 29 C.F.R. § 1602.14 (1983).

Prior to the filing of the Commissioner's charge, four individual charges alleging employment discrimination by A & P had been filed with the EEOC. On June 23, 1972, Theodore Alexander alleged that he had been denied promotions to managerial positions, assigned to stores in predominately black areas, and denied overtime on account of his race. On October 31, 1973, Henry LeSesane alleged that he had been required to take a polygraph examination following a store robbery and had twice been demoted because of his race. LeSesane supplemented his original charge in August of 1974, alleging that he had been denied a promotion to assistant manager on account of race. In November of 1973, Bernie Holland charged that he had been denied a transfer from a produce to a grocery department because of his race. When he was discharged, Holland added an allegation of discriminatory discharge. Finally, in March of 1974 Katie Lomax charged that A & P had repeatedly refused to permit her to apply for employment on grounds of race and sex, and that when she was hired she was denied access to higher-paying jobs reserved for men.

The Commissioner's October 17, 1974 charge differed significantly from these four individual charges. First, the Commissioner's charge named as respondents not only A & P, but fourteen unions having collective bargaining agreements with the company. Second, the charge was made not on behalf of the four named individuals, but

> on behalf of an aggrieved class with a membership which includes, but is not limited to, all persons who have been and who continue to be or might be adversely affected by the unlawful employment practices [alleged therein].

App. at 242. Third, the Commissioner's charge was far more extensive than any of the four individual charges. The charge alleged a pattern or practice of discriminatory employment practices against blacks and females

> with respect to hiring, layoff, recall, wages, discharge, promotions, seniority, job classifications, training, exclusion, union representation, benefits, segregated facilities, and other terms and conditions of employment . . . .

App. at 239–40. Moreover, the charge particularized that the practices complained of included but were not limited to:

1. Refusing and failing to recruit and hire blacks and females for positions at all levels of employment at respondent's facilities on an equal basis as white males because of their race, color and sex.

2. Following a policy or practice of hiring and assigning its female employees on the basis of sex with female employees being hired for and assigned to the less desirable and generally lower paying jobs with the least opportunity for advancement.

3. Following a policy and practice of denying blacks assignments into more desirable and generally higher paying jobs with the greatest opportunity for

---

8. 42 U.S.C. § 2000e–5(d) provides:

In the case of any charge filed by a member of the Commission alleging an unlawful employment practice occuring in a State or political subdivision of a State which has a State or local law prohibiting the practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice ..., the Commission shall, before taking any action with respect to such charge, notify the appropriate State or local officials and, upon request, afford them a reasonable time, but not less than sixty days ... to act under such State or local law to remedy the practice alleged.

advancement on an equal basis as whites because of their race.

4. Refusing and failing to provide benefits to female employees on the same basis as to male employees because of their sex.

5. Refusing and failing to hire and/or promote blacks and females into supervisory positions at its divisional headquarters on an equal basis as white males.

6. Engaging in additional acts and practices which discriminate against black and female persons with respect to their compensation, terms and conditions, and privileges of employment and which limit, segregate and classify their black and female employees in ways which deprive or tend to deprive them of employment opportunities or adversely affect their status as employees because of their race, color or sex. These acts and practices include, but are not limited to:

a. Failing and refusing to transfer, assign or promote black and female persons on the same basis as white males;

b. Failing to provide opportunities for apprenticeship, training and advancement to black and female applicants for employment and employees equal to those opportunities provided to white male applicants for employment and employees;

c. Failing to provide opportunities for advancement into supervisory positions to black and female employees equal to those opportunities provided to white male employees; and

d. Failing to take reasonable and appropriate action to correct the present effects of their past discrimination.

App. at 240–41.

In addition to these charges against A & P, the Commissioner's charge alleged discrimination by the respondent unions:

7. The respondent employer and the respondent unions and their locals, have entered into collective bargaining agreements which establish seniority systems and procedures for promotion, demotion, layoff, recall, benefits, transfer and other terms and conditions of employment which are based upon the length of service in certain occupations, lines of progression, departments, areas or union jurisdictions from which black and female persons have been excluded or had only limited access, which therefore, deprive black and female employees of the opportunity to compete on an equal basis with their white male contemporaries for more desirable and better paying jobs. The respondent unions and their locals, and the respondent employer have failed and refused to take appropriate action to correct such systems and procedures and to eliminate the discriminatory effects resulting therefrom.

App. at 241–42.

### B. The Investigation

Affidavits filed on behalf of the EEOC in opposition to A & P's motion for summary judgment, which for our review must be read in the light most favorable to the EEOC, set forth the course of the agency's statutory investigation of the Commissioner's charge. During the first year of that investigation the Commission made no progress whatsoever, a consequence of A & P's active resistance to the Commission's efforts. In meetings held during December 1974 and January 1975, the EEOC requested data necessary for its investigation. Jordan affid., App. at 141–42. A & P informed the EEOC on January 16, 1975, that it would not comply with the Commission's requests for information. Hartland letter, App. at 245–47. The EEOC submitted a second request for documents on January 30. That request sought, for example, names of employees transferred, terminated, and assigned to training programs; lists of certain supervisory personnel; and copies of examinations used for hiring, promotions, and training, categorized where necessary by name, race, and sex. Rogers letter, App. at 249–57. A & P resisted the Commission's request a second

time on February 10. Hartland letter, App. at 259–60. On February 13 and 14, the EEOC served two subpoenas on A & P requesting certain documents. A & P, in turn, responded that it would not comply with these subpoenas and petitioned the EEOC to revoke or modify them. Hartland letter, App. at 262. In June and July of 1975, the EEOC made determinations not to revoke either subpoena, and several weeks later informed A & P that it would seek a court order compelling their enforcement. Jordan affid., App. at 143. A & P finally agreed to provide the requested materials in October of 1975. *Id.*

Thus, as a practical matter the Commission's statutory investigation did not begin until October of 1975. The investigation concluded in the spring of 1978. In an initial investigative phase ending in December of 1976, the EEOC compiled data on A & P employees. A detailed affidavit by William Jordan, a Philadelphia EEOC Office supervisor responsible for the A & P investigation, reveals that the EEOC was greatly hampered during this phase by the disorderly and incomplete nature of the company's records. Jordan attests, for example, that "[v]erbal communications were the rule rather than the exception," that "[r]eports from the field operations were not submitted in any systematic or timely manner," and that records were sometimes "incomplete or inaccurate when checked against the employee's personnel folder." App. at 145–46. The company kept no information identifying employees by race or sex, *id.*, obliging EEOC investigators to identify race and gender "on a piecemeal basis requiring a door-to-door approach by the Commission, A & P, and Union respondents." App. at 147. Records were stored in many locations around the country. Jordan attests:

A & P did not have any compiled information predating 1975. It had separate employment record cards and personnel folders for each employee on file. The [Philadelphia] Division, two warehouses and 127 stores' employees files were kept at the Division; active Bakery employees' files were at the Bakery, inactive employees' files were kept at a location outside the City. The files of the former delicatessen employees were finally located in Wisconsin. Salary information for all employees, which did not pre-date 1973, was kept at a location outside of the City.

App. at 145–46. By December of 1976, "4000 personnel files totalling in excess of 100,000 pieces of paper, were examined and information hand copied." App. at 147.

At the conclusion of the initial investigative phase in December of 1976, the EEOC requested that A & P submit a position letter with respect to the five individual charges that had been consolidated in the Commissioner's charge. Jordan affid., App. at 148. A & P responded in January of 1977, by which time the EEOC had begun to analyze the information already received. A detailed summary of this analysis is in the record. Jordan affid., App. at 148–51. According to Jordan, "[c]omputer analysis was not feasible because the Company did not have computerized information and was producing documents on a piecemeal basis." App. at 148. The Commission conducted at least six employment analyses of the Retail Clerks Unions alone, one of which involved 30,055 personnel actions. App. at 150. Similar analyses were performed on employees represented by other unions. In addition, the Commission conducted historical analyses of the company's collective bargaining agreements. Those analyses examined the impact of bargaining changes on the composition of the workforce in terms of race and gender. One such analysis determined that, when A & P began reducing its workforce in 1973, the company and union agreed to substitute "job seniority" for "company seniority," as a result of which the percentage of white male demotions decreased when the percentage of white female, black male, and black female demotions increased. App. at 151. There is no suggestion in the record that these analyses were unnecessary to the Commission's investigation or conducted in a dilatory or protracted fashion.

## C. The Reasonable Cause Determinations

The EEOC concluded the analytical phase of its investigation early in the spring of 1978. In April of 1978, the Commission approved determinations of reasonable cause on each of roughly 100 issues. App. at 164–223, *see* Jordan affid., App. at 152. The Determination itself, served on the respondents shortly after May 12, 1978, is over 60 pages of single-spaced text in length. The issues addressed by the Reasonable Cause Determination are too numerous to list here, but a sampling suffices to convey its import.

Certain EEOC determinations were based on company-wide hiring practices. For example, the Commission determined that:

> The Employer's practice is to limit its recruitment and hiring of female clerks to starting them to work as part-time checkers, whereas it recruits and hires male clerks on a full-time basis .... More than two-thirds of the female clerks were hired part-time, while more than two-thirds of the male clerks were hired full-time.

Decision, App. at 184. Similarly, the Commission determined that A & P engaged in a practice of limiting black employees to promotion and transfer in stores in predominately black neighborhoods. App. at 187.

Other of the Commission's determinations relied on the individual charges of discrimination consolidated with the Commissioner's charge. For example, the Commission cited Theodore Alexander as an example of a black employee who had been refused transfers to stores outside of predominately black neighborhoods. App. at 190. In addition, the Commission incorporated in its Determination the disposition of a sixth individual charge of discrimination, that of Aaron Jackson, filed with the EEOC in 1976. App. at 171, 190–93.

## D. Conciliation Efforts

On May 16, 1978, the parties held a conciliation conference. Further discussions, they agreed, would be held in abeyance until the EEOC made specific monetary requests for backpay. In September of 1979, the Commission submitted the names of roughly 500 A & P employees who the Commission believed were entitled to backpay. Jordan affid., App. at 154. In a letter dated October 11, 1979, the EEOC explained the methodology used for computing back pay. *Id.* After further exchanges of correspondence, the parties agreed to another conciliation meeting on January 25, 1980. At that meeting, EEOC representatives explained in detail the methodology used to calculate backpay and stated that if the respondents suggested a better method it would be considered. A & P declined to do so, but requested additional detailed information. Jordan had no knowledge of any independent effort made by A & P to investigate the charges or to gather and preserve evidence relating to the reasonable cause determinations. Jordan affid., App. at 155. The EEOC emphasized that without A & P cooperation or a counter-proposal, conciliation would be deemed a failure. *Id.*

On February 11, 1980, the EEOC served notice on the respondents of failure of conciliation. *Id.* Counsel for A & P responded on March 11, 1980 with a request for further conciliation:

> The Company is troubled by this letter because it seems such an abrupt cessation of our mutual conciliation efforts. As we have reiterated to Mr. William Jordan of your office on numerous occasions, the Company would prefer to resolve this matter by means of conciliation rather than litigation. But the Company could not evaluate and hence could not concretely respond to the Commission's monetary demands because the Company was never advised of the essential basic information pertinent to those demands. For example, and as we repeatedly requested, we need to be informed as to the nature or basis of the individual claims, the time period covered by the claim, the method by which the individual monetary amounts were calculated or the rationale underlying these amounts, etc.

Schoenholtz letter, App. at 442. Thus, it is clear that in March of 1980 A & P actively sought postponement of the filing of a lawsuit, while at the same time taking no steps toward the preparation of any counter-proposals to the EEOC's back-pay request.

A & P pleas for the renewal of conciliation did not stop with requests from its counsel. In July of 1980, Hobart Taylor, a member of the A & P Board of Directors, approached the EEOC directly and requested that conciliation efforts continue. According to the affidavit of Jane Dolkart, Assistant General Counsel to the EEOC, Taylor

> was aware that conciliation of a pattern and practice suit against A & P had been conducted and failed. He indicated that he understood a lawsuit would be filed, but that he was anxious to avoid suit and try and settle the case. He further advised me that he felt the attorneys representing A & P had not taken the right tack and that the issues between A & P and the Commission were not unresolvable. He reiterated that there was still a chance to conciliate the suit and that he was anxious to do so.

Dolkart affid., App. at 138–39. At the direction of Eleanor Holmes Norton, Chairwoman of the EEOC, Dolkart responded by telephone on July 23, 1980 that "we would not interfere with the Philadelphia[ ] [Office's] processing of the suit." *Id.* Dolkart informed the Philadelphia EEOC office of the substance of the discussion with Taylor on August 6, 1980. *Id.*, App. at 140; Lewis affid., App. at 157.

In October of 1980, Taylor telephoned Spencer Lewis, Regional Attorney for the Philadelphia Office, and "expressed his dissatisfaction with the handling of the A & P case by the attorneys who had been representing A & P and stated that he was hopeful that a settlement proposal would be possible and forthcoming for our consideration." App. at 158. Lewis, in turn, responded

> that I could not formally reopen conciliation but that the Commission was willing to consider any settlement proposal

which A & P made. I explained to Mr. Taylor that if a proposal was not forthcoming within a reasonable time, the office had no choice but to continue processing the case and file suit in Federal Court.

*Id.* Lewis attested that, "[b]ased on my representations to Mr. Taylor, the Commission waited to receive a counter proposal from A & P." *Id.* In early 1981, Lewis stated, "having received no further contacts from Mr. Taylor[,] it was determined that no settlement proposal was forthcoming." *Id.* at 158–59.

On October 9, 1981, the Philadelphia Office received authorization to file this action. App. at 159. The complaint was filed on December 31, 1981. The record does not disclose any efforts at settlement after its filing.

## III.

### *The District Court's Ruling*

A & P entered an appearance in the district court on January 3, 1982. Thereafter various stipulations extended the time for filing an answer. A & P's motion for summary judgment was eventually filed on June 19, 1982, supported by five affidavits. More specific reference to the contents of these affidavits will be made in connection with our discussion of the merits of the summary judgment. For present purposes they may be summarized as establishing (1) that during the 1970's A & P suffered financial difficulties which resulted in closing many of its business operations; and (2) that many persons having personal knowledge of personnel practices during the period covered by the complaint are no longer employed at A & P. EEOC filed affidavits in opposition to the summary judgment motion on July 25, 1982.

On May 13, 1983, over sixteen months after the filing of the complaint and over eight months after the completion of the summary judgment record, the trial court granted defendants' motion. Observing that "[a]pproximately nine and one half years passed between the time when the

first employee charge was filed with the EEOC and when the EEOC filed this action," App. at 12, the district court held that the suit was barred by laches. Recognizing that a laches defense involves both inordinate delay attributable to a plaintiff and resulting undue prejudice to a defendant, the court addressed both aspects of the defense.

### A. Inordinate Delay

The court attributed "inordinate delay" to three "large gaps in the administrative process." *Id.* The first of those "gaps," the court reasoned, occurred between the "filing of the first individual charge" in June of 1972 and the filing of the Commissioner's charge in November of 1974. *Id.* The second hiatus occurred, in the district court's view, between October of 1975, after A & P had stopped actively resisting the Commission's efforts, and May of 1978, when the EEOC served its Determination of Reasonable Cause. *Id.* The court acknowledged that "A & P's disorganized record-keeping system, A & P's failure to cooperate, and the sheer volume of documents which [the Commission had] examined to prepare this case" had "contributed to the delay," but concluded that "they do not fully explain the gaps in the administrative process ...." App. at 13. The last gap attributed by the district court to the EEOC occurred between February of 1980, when the Commission served notices of failure of conciliation on all respondents, and December of 1981, when the Philadelphia Office filed this action. The district court discounted the Commission's explanation that this third delay had been occasioned by A & P's representation that a settlement proposal would be forthcoming:

> In particular, the EEOC attributes the delay following the end of conciliation to a personal request made by Hobart Taylor, a now-deceased member of the Board of A & P, to the Chair of the EEOC .... Reliance by the EEOC on such a channel of communication should not be allowed to excuse the Commission's delay. Nor may plaintiff invoke its local office's "forbearance" in recommending suit to

the Washington office following A & P's request to reopen conciliation. Given the Commission's own statement of February 11th that it would not reopen conciliation, and its refusal in fact to reopen conciliation after this date, any subsequent delays in filing suit can only be considered its own responsibility.

App. at 13 n. 6.

### B. Undue Prejudice

Prejudice to A & P, the trial court concluded, resulted principally from changes that occurred in its organizational structure between 1975 and 1981:

> During the time since 1975 when the EEOC conducted its investigation of A & P and made its Determination, the company's Philadelphia Division has been extensively restructured. Economic factors led A & P to close most of its retail stores in the area as well as its bakery and warehouses, which were the sites of the alleged discriminatory practices. The Philadelphia Divisional Office was stripped of its management responsibilities in 1975, and its functions were transferred to the Keystone Regional Office in Valley Forge, Pennsylvania. That office was downgraded in 1977, and finally closed in 1979, when most of its employees were terminated ....

> As a result of this restructuring, most of the Division's managerial employees who played a part in the personnel practices attacked in this suit have left the company. For example, of the 173 store managers employed by the company in March of 1975, who had direct responsibility for job assignment in their stores, 137 no longer work for A & P .... Of the 15 District Managers employed by A & P in March of 1975, who determined promotion of workers from part-time to full-time status, 11 are no longer employed by A & P. Robert Jordan, Vice-President of the Philadelphia Division from 1970–1974, died in 1978. A & P's chief labor negotiator from 1974 to 1981,

Henry Boyle, retired in January of 1981 and now lives in Florida.

App. at 15–16.

A & P also asserted that many of its relevant employment files were lost during the Division's dismantling. This argument the trial court discounted as subordinate to the more important "restructuring of the Philadelphia Division· and the loss of personnel during the time in which the EEOC was delaying this action . . . ." App. at 16. The district court then dismissed the complaint as to all respondents.[9]

## IV.

### A. Availability of a Laches Defense in an EEOC action

Because the plaintiff is a governmental agency, we note that it is at least problematical, absent federal statutory authority, whether laches is ever a defense against the national sovereign. *See, e.g., Costello v. United States*, 365 U.S. 265, 281, 81 S.Ct. 534, 542, 5 L.Ed.2d 551 (1961); *United States v. Summerlin*, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940); *Board of County Comm'rs v. United States*, 308 U.S. 343, 351, 60 S.Ct. 285, 288, 84 L.Ed. 313 (1939). The rule that laches does not apply to the federal sovereign has been applied even when the United States sues on behalf of others. *E.g., Board of County Comm'rs.*, 308 U.S. at 351, 60 S.Ct. at 288; *United States v. Minnesota*, 270 U.S. 181, 196, 46 S.Ct. 298, 301, 70 L.Ed. 539 (1926) (suit for equitable relief on behalf of Indians). Thus the EEOC's status as an arguably representative litigant is not dispositive of the availability of a non-statutory time bar against its suit. Moreover, the references in *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 373, 97 S.Ct. 2447, 2458, 53 L.Ed.2d 402 (1977), and *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424–425, 95 S.Ct. 2362, 2374–75, 45 L.Ed.2d 280 (1975), to the district court's power to afford protection from prejudice arising from delays in prosecution may well speak only to the discretion which 42 U.S.C. § 2000e–5(g) (1976) affords respecting the imposition of back pay liability rather than other forms of prospective equitable relief.

Those courts that have addressed the laches doctrine in EEOC actions, *see* note 1 *supra*, have not discussed the applicability to EEOC Title VII suits of the rule that the laches defense does not apply to a suit by the federal sovereign. Each court has assumed that the defense would be available as a complete bar to relief, rather than as a guide to the court in fashioning a remedy.

We need not, however, decide the issue at this juncture. Even assuming the availability of laches as a bar to relief, we conclude below that the elements of the defense have not, on this record, been established as a matter of law. Thus we need not decide the availability of the defense in other cases. We simply assume arguendo, without deciding, that laches may in some cases bar an EEOC action rather than simply counsel a modification of the remedy.

### B. Elements of the Laches Defense

▮ The elements of the equitable defense of laches are "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961). These elements are conjunctive, and since laches is a defense, the burden of establishing both is on the defendant. If a statutory limitations period that would bar legal relief has expired, then the defendant in an action for equitable relief enjoys the benefit of a presumption of inexcusable delay and prejudice. In that case, the burden shifts to the plaintiff to justify its delay and negate prejudice. *See Pierre v. Hess Oil Virgin Islands Corp.*, 624 F.2d 445, 450 (3d Cir.1980); *Gruca v. United States Steel Corp.*, 495

---

**9.** The court held that the labor union respondents were also prejudiced by EEOC's delay. Because EEOC's appeal against those respondents was voluntarily dismissed, they are not before us.

F.2d 1252, 1260 (3d Cir.1974); *Burke v. Gateway Clipper, Inc.*, 441 F.2d 946, 948–50 (3d Cir.1971) (per curiam). No statute of limitations applies to an EEOC Title VII action. *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977). Thus, the burden remains on A & P to establish both elements of the defense. On summary judgment, the movant's affidavits must establish a prima facie defense of laches. *See In re Japanese Elec. Prods. Antit. Litig.*, 723 F.2d 238, 258 (3d Cir. 1983).

### C. Scope of Review

 Length of delay and other matters of historical circumstance are questions of fact. In the event that the district court makes findings of fact on these matters, our scope of review is whether these findings are clearly erroneous. Fed.R. Civ.P. 52(a); *Churma v. United States Steel Corp.*, 514 F.2d 589, 593 (3d Cir.1975). On this summary-judgment record, of course, no such factual findings were possible. Thus, we view the facts as they are set forth in the affidavits, in the light most favorable to the non-moving party, in order to determine whether there are material issues of disputed fact. Our scope of review over that determination is plenary. *See In re Japanese Elec. Prods. Antit. Litig.*, 723 F.2d 238, 257–58 (3d Cir.1983); *Coastal States Gas Corp. v. Department of Energy*, 644 F.2d 969, 978–79 (3d Cir. 1981); *EEOC v. Massey-Ferguson, Inc.*, 622 F.2d 271, 276 (7th Cir.1980).

 The question whether delay is "inexcusable" on the facts presented is a conclusion of law over which our review is also plenary. *Churma*, 514 F.2d at 593. If we agree with the district court's legal conclusion that a given historical delay is inexcusable, we review the court's assessment of the equities for abuse of discretion. *Id.* That discretion must be exercised with an eye toward "locat[ing] 'a just result' in light of the circumstances peculiar to the case ...." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424, 95 S.Ct. 2362, 2374, 45 L.Ed.2d 280 (1975).

 Moreover, in an EEOC Title VII case the trial court's discretion in applying the laches defense, assuming its availability, must take into account that the EEOC is vindicating both the public interest in eliminating employment discrimination and the private interests of those class members it represents. The court's discretion must also be exercised commensurately with Congress' purpose that the Commission's capacity to investigate charges of discrimination not be undermined. As the Supreme Court recently held,

> it is crucial that the Commission's ability to investigate charges of systemic discrimination not be impaired. By 1972, Congress was aware that employment discrimination was a "complex and pervasive" problem that could be extirpated only with thoroughgoing remedies; "[u]nrelenting broad-scale action against patterns or practices of discrimination" was essential if the purposes of Title VII were to be achieved. The EEOC, because "[i]t has access to the most current statistical computations and analyses regarding employment patterns" was thought to be in the best position "to determine where 'pattern or practice' litigation is warranted" and to pursue it. Accordingly, in its amendments to § 707, Congress made clear that Commissioners could file and the Commission could investigate such charges. Our interpretation of the EEOC's regulations should not undercut the exercise of those powers.

*EEOC v. Shell Oil Co.*, — U.S. —, —, 104 S.Ct. 1621, 1630–31, 80 L.Ed.2d 41 (1984) (footnotes omitted). Thus, the court's exercise of discretion, and our review over that exercise, must take into account whether or not a less drastic form of equitable relief than a complete dismissal of the action would have been more appropriate. With these principles in mind, we turn to each period of delay that the trial court held to be inexcusable.

### D. Inordinate Delay

#### 1. June 1972—November 1974

As noted in Part III A, the district court attributed to the EEOC an inordinate delay

between the filing of an individual charge by Theodore Alexander on June 23, 1972, and the filing of the Commissioner's charge in November of 1974. This was legal error. The Commissioner's charge was far more extensive than any of the four individual charges that antedated it. Nothing in the summary-judgment record establishes that the filing of any one of the individual charges, or all four of them, against A & P—a national company with thousands of employees at hundreds of locations—put the EEOC on notice that the Company was engaged in the extensive pattern and practice of race and sex discrimination with which it was later charged. EEOC receives thousands of individual charges, many of them frivolous. It would be entirely inconsistent with the public enforcement responsibilities imposed on the EEOC by the Equal Employment Opportunity Act of 1972 to hold that an equitable time bar against such public enforcement began running from the earliest-filed individual charge. Delay in processing an individual charge cannot relieve A & P of the obligation of defending a much broader action on behalf of classes of employees. *EEOC v. American National Bank*, 574 F.2d 1173, 1175–76 (4th Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 213, 58 L.Ed.2d 190 (1978).

■ We do not hold that delay must invariably be measured from the date of a Commissioner's charge. If, for example, that charge merely restates a long-inactive individual charge, delay from the individual's filing date to the Commissioner's filing date might be a relevant consideration. But where, as here, the Commissioner's charge is both independent of and supplementary to the individual charges, reliance on such delay cannot be justified. On this record the earliest date from which delay supporting laches could, as a matter of law, be assessed against the EEOC is November 18, 1974, when the local agencies waived jurisdiction.

### 2. October 1975—May 1978

■ On December 6, 1974, EEOC served notice of the Commissioner's charge on A & P. At that time, A & P was on notice of its duty to "retain personnel records pertinent to [its] treatment of women and members of minority groups." *EEOC v. Shell Oil Co.*, —— U.S. at ——, 104 S.Ct. at 1634 (footnote omitted). Our consideration of any delay occurring thereafter must take into account the fact of such notice and A & P's reaction to it. A & P's initial reaction was to resist the EEOC's investigation. The trial court correctly, therefore, disregarded the delay occurring between December of 1974 and October of 1975, when active resistance to the investigation ceased.

■ The court did, however, hold that the period between October 1975 and May of 1978, when the agency served its Determination of Reasonable Cause, is chargeable to the EEOC and constituted inexcusable delay. Keeping in mind that A & P's affidavits must establish a prima facie defense of laches, we cannot approve that holding. A & P filed five affidavits in support of its motion for summary judgment. None of those affidavits even speaks to the scope of EEOC's investigation, the ease or difficulty with which it might have been accomplished, the condition of A & P's personnel records, or the accessability to EEOC of knowledgeable persons during the investigatory period. Instead, the affidavits primarily address changes which have taken place in A & P's business that may now make A & P's defense of the lawsuit more difficult than it might otherwise have been. Those difficulties, while relevant to the issue of prejudice, are irrelevant to the causes of the delay during the statutory investigation. In addition, most of the changes in A & P's business operations to which they refer took place after A & P was on notice of its duty to retain personnel files until the resolution of the charge. For example, the Mull affidavit alleges that the Philadelphia Bakery went out of business on May 28, 1977. App. at 57. The Varian affidavit alleges that the Office of the Philadelphia Division closed in 1977. App. at 64. Of the store closings listed in the Smith affida-

vit, the vast majority occurred after notice of the Commissioner's charge. App. at 84–102. Rather than shedding any light on the question why the EEOC investigation might have been more expeditious, they tend to explain why the investigators may have encountered difficulties. Consequently, A & P's affidavits do not establish inordinate delay during the investigatory period.

Moreover, the EEOC did file affidavits, which in contrast with those filed by A & P do account for the duration of the investigation. As noted in Part II above, the investigation involved two phases: accumulation of information, and analysis of data and drafting of the Reasonable Cause Determination required by law.

The affidavit of William Jordan explains that the accumulation of data required fourteen months. Because A & P kept no records identifying employees by race or sex, thousands of A & P employees had to be interviewed. Employee personnel files were located throughout the country. Some 4000 such files were examined. Often these files were incomplete or inaccurate and required constant checks against other records. On this summary judgment record we must, of course, read the EEOC affidavits in a light most favorable to it. But in fact, as we have already observed, there is really no dispute about the reasons for the duration of the investigation. The A & P affidavits tend, if anything, to confirm the difficulties mentioned in Jordan's affidavit. There is nothing in the record establishing that, given the resources available to the EEOC, the accumulation of data could have been accomplished in less than fourteen months.

With respect to the analytical phase of the investigation, Jordan's affidavit explains that the preparation of the Reasonable Cause Determination—itself a document over sixty single-spaced pages in length, addressing some 100 issues—required extensive analyses of over 4000 personnel files containing more than 100,000 pages. We refer in Part II above to the details of that analytical task. There is

nothing in the record suggesting that any of the analytical work was unnecessary, that EEOC rejected feasible methods that would have accomplished the task more quickly, or that it had additional resources that could have been set to the task. In the absence of some standard of comparison in the record, it was legal error to conclude that the analytical phase of the investigation and the preparation of the Reasonable Cause Determination should have been accomplished in less time than it took. Indeed, the EEOC's timetable for those tasks compares favorably with the sixteen months that elapsed between filing of the complaint and entry of summary judgment.

We note as well that a conclusion that the duration of the investigative period constituted inordinate delay would undermine an important purpose of the Act. That conclusion would inevitably place undue pressure on the Commission to conduct hasty or incomplete investigations and would encourage the Commission to render premature Reasonable Cause Determinations. Those consequences would undermine one of the central purposes of the Act that "the Commission's ability to investigate charges of systemic discrimination not be impaired." *EEOC v. Shell Oil Co.,* —— U.S. at ——, 104 S.Ct. at 1630–31. Thus, we hold that the district court's conclusion that the period from October 1975 to May 1978 constituted inexcusable delay was an error of law.

### 3. February 1980—December 1981

 Finally, the trial court held that the 22 month lapse between February of 1980 and December of 1981 involved unreasonable delay. In so holding the court committed legal error, for it disregarded the congressional direction to the EEOC that it *must* attempt conciliation, 42 U.S.C. § 2000e–5(b) (1976), and that "[c]ooperation and voluntary compliance were selected as the preferred means of achieving [compliance]." *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974). Counsel for A & P as

late as March of 1980 requested in writing that conciliation efforts continue. In July of 1980 and in October of 1980, Hobart Taylor, an A & P board member, sought to have the filing of a suit withheld so that settlement negotiations could continue. Taking A & P at the word of its emissary, the Philadelphia Office of the EEOC waited for a promised settlement proposal. It filed the action only when, after a reasonable time, none was forthcoming.

The trial court's ruling with respect to Hobart Taylor's conciliation overtures, *see* Part III A *supra*, is legally indefensible. Neither Title VII nor any regulation known to us suggests that the director of a corporation is an inappropriate participant in the congressionally favored process of voluntary compliance. Nor is it relevant that the Commission's efforts toward voluntary settlement occurred after serving the notice of failure of conciliation. The express policy of Title VII favors voluntary compliance not only before, but even after an EEOC suit is filed. Hence, as we have observed, Title VII authorizes the stay of an action for 60 days pending "further efforts of the Commission to obtain voluntary compliance." 42 U.S.C. § 2000e–5(f)(1) (1976). It would be inconsistent with that policy to attribute to the EEOC delays which, on this record, were attributable to A & P's own request that the policy of voluntary compliance be honored. Any such holding would penalize the EEOC for engaging in precisely the course of "conference, conciliation and persuasion" mandated by Congress, and would discourage the EEOC from entertaining settlement overtures after serving a notice of failure of conciliation.

▆▆ Consequently, we hold that the district court's conclusion of inexcusable delay cannot, as a matter of law, be sustained. We therefore have no occasion to decide whether, had *any* of the delay been inexcusable, a dismissal of the entire complaint on grounds of laches would in these circumstances have constituted an abuse of the district court's discretion.

### E. Prejudice

▆▆ The elements of the laches defense are conjunctive. Our conclusion that the trial court erred with respect to inexcusable delay therefore requires a reversal of the summary judgment. Issues of prejudice due to delay may, however, arise in future stages of the case with respect to the scope of relief. *See* 42 U.S.C. § 2000e–5(g) (1976). We therefore deem it appropriate to note that the principal prejudice relied upon by the trial court—changes in management personnel as a result of the restructuring of A & P's business—would not as a matter of law satisfy the prejudice element of the laches defense. The fact that many former store managers have been dismissed because of a contraction of A & P's business does not establish their unavailability. *See Bernard v. Gulf Oil Co.*, 596 F.2d 1249, 1257 (5th Cir.1979), *rev'd on other grounds in banc*, 619 F.2d 459 (5th Cir.1980), *aff'd*, 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981); *Fowler v. Blue Bell, Inc.*, 596 F.2d 1276, 1279 (5th Cir.1979); *cf. EEOC v. Dresser Industries, Inc.*, 668 F.2d 1199, 1203 (11th Cir.1982) (finding unavailability). Moreover, most of EEOC's charges are based on employment records that were extant for purposes of EEOC's own investigation. Presumably these records are still available. *See EEOC v. Massey-Ferguson, Inc.*, 622 F.2d 271, 279 (7th Cir.1980). Any records unavailable by virtue of A & P's failure to comply with the record-preservation requirements of 29 C.F.R. § 1602.14 (1983) would not, of course, qualify as establishing prejudice.

We are cognizant that A & P is not the same business that it was ten years ago. The district court has ample authority to tailor the scope of relief accordingly—bearing in mind, of course, the remedial purposes of Title VII. Section 706 of the Act authorizes the district court to "order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., or any other equitable relief as the court deems appropri-

ate." 42 U.S.C. § 2000e–5(g) (1976). But if the charges of discrimination prove true, A & P may not wash its hands of years of employment discrimination by instituting unilateral changes in its business, and then complain that it is unable to defend the charges of discrimination because it has unilaterally instituted such changes.

### V.

Because the summary judgment record contains nothing that as a matter of law would justify a holding of inexcusable delay, the summary judgment in favor of A & P must be reversed.